**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| SHELLEY C. WHITE, Jr.<br>905 Coachway<br>Annapolis, Maryland 21401 | : <br> : <br> : <br> : <br> : |
| CARL BOUIE<br>129 Timber Lane<br>Grasonville, Maryland  21638 | :     CASE NO: <br> : <br> : <br> : |
| JAMES SPEARMAN, Jr.<br>1321 Sycamore Avenue<br>Annapolis, Maryland 21401 | : <br> : <br> : <br> : |
| FLOYD CARSON, JR<br>23701 Robert Way<br>Leonardtown, Maryland 20650 | : <br> : <br> : <br> : |
|        Plaintiffs<br>v. | : <br> : <br> : |
| CITY OF ANNAPOLIS (MD)<br>     Serve on:<br>     City of Annapolis Office of Law<br>     93 Main Street, Suite 300<br>     Annapolis, Maryland 21401 | : <br> : <br> : <br> : <br> : <br> : |
|      Defendant. | : <br> : <br> : |

## PLAINTIFFS' COMPLAINT

Plaintiffs through undersigned attorney hereby file this *Complaint* against Defendant. This is an action alleging workplace discrimination, harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*.   At all relevant times, Plaintiffs were "employees" of Defendant, as defined under Title VII.   Plaintiffs have exhausted their administrative remedies and this matter is ripe for adjudication.

## I.      THE PARTIES, JURISDICTION AND VENUE

1.      Plaintiff, Shelley C. White, Jr. ("Officer White"), resides in Anne Arundel County, Maryland, and was recently terminated by Defendant.  Officer White served as a police officer with the City of Annapolis Police Department for approximately 20 years.

2.      Plaintiff, Carl Bouie ("Officer Bouie"), resides in Queen Anne's County, Maryland, and was recently terminated by Defendant.  Officer Bouie served as a police officer with the City of Annapolis Police Department for 20 years.

3.      Plaintiff, Sergeant James Spearman ("Sergeant Spearman"), resides in Anne Arundel County, Maryland, and is currently employed by Defendant.  Sergeant Spearman has served as a police officer with the City of Annapolis Police Department for 27 years.

4.      Plaintiff, Floyd Carson, Jr. ("Officer Carson"), resides in St. Mary's County, Maryland, and was recently relieved of his duties with Defendant.  Officer Carson served as a police officer with the City of Annapolis Police Department for 13 years.

5.      Defendant is a municipal agency and is subject to the jurisdiction of this Court. Defendant is an employer within the meaning of 42 U.S.C. §2000e-(b).

6.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331, 1343.

7.      This Court has original jurisdiction over civil actions arising under the laws of the United States pursuant to 28 U.S.C.A. § 1331.

8.      Plaintiffs were employed, or are still currently employed, by Defendant in Annapolis, Maryland, throughout the relevant time period cited by this *Complaint*.

9.      Venue in this Court is proper because the cause of action arose in Anne Arundel County, Maryland.

## II.     STATEMENT OF FACTS

### A.     OVERVIEW OF ANNAPOLIS POLICE DEPARTMENT WITH RESPECT TO THE ISSUE OF RACE AND EQUALITY

10.     Historically speaking, the Annapolis Police Department once featured a number of African-American officers in supervisory and management roles. Under the administration of then Police Chief Joseph S. Johnson (African-American), African-Americans occupied the following positions:

- One Major;
- One Captain;
- Three (3) Lieutenants;
- Five (5) Sergeants;
- Three in the CID Division;
- One in the Narcotics Division;
- One in the K9 unit;
- Ten (10) in the Community Policing department; and
- One in the role of Director of the Safe Communities Program funded by the Housing Authority of the City of Annapolis.

11.     In stark contrast, upon information and belief, there is presently only one African-American assigned to a management positions.

### B.     ANNAPOLIS POLICE DEPARTMENT CLASS OF 1993

12.     On March 12, 1993, the Annapolis Police Department swore in sixteen (16) new officers, to include Plaintiffs Officer White and Officer Bouie. The new class brought the total complement of police officers to 121. The composition of the class of 16 officers included six (6) African-American males and two (2) white females. The class boosted the number of diverse

officers in the department.  Prior to the entry of the new class, the Police Department included 26 African-American males, five (5) African-American females, eleven (11) white females, two (2) Hispanic males and one Asian male.  Those numbers represented roughly 37% of the total force.

13.     The 16 new officers were selected out of 430 candidates who applied for the positions.  Five of the 16 officers had Bachelor's Degrees, to include Officer White.  Two of the 16 officers had Associate's Degrees.  Three were enrolled in undergraduate courses and four had military backgrounds, to include Officer Bouie.

14.     Presently, only nine (9) of the original class of 16 officers are still employed with the Annapolis Police Department.  The racial composition of that group is as follows:

- 4 African-American males;

- 4 White males; and

- 1 White female.

None of the above-referenced African-American officers have been promoted to a management or supervisory position.  The highest rank attained by any of those four officers was Officer First Class.  In comparison, all four white male officers have received advancements (three as Lieutenants and one as a Detective, who is the Chief Shop Steward), and the white female has been promoted to the rank of Sergeant.

## C.     A HISTORY OF DISPARATE TREATMENT

15.     African-American officers in the Annapolis Police Department are subjected to unequal treatment.  Most regrettably, white officers receive little, if any, sanctions for improper conduct while African-American officers are frequently targeted for harsh outcomes for even minor events.  Examples of this disparity would include, but are not limited to the following instances:

- Two (married) white Sergeants, J. Kirchner and G. Kirchner, filed a false accident report, identifying that the accident took place in the City of Annapolis, when it actually took place elsewhere.  Instead of being terminated, both continued to maintain their supervisory status.

- A white male officer, named  David Stokes had a Protective Order issued against him for one year related to a domestic assault matter.  The Order instructed that he was not to be in possession of any firearms.  He was not investigated or punished.  Instead, he was reassigned to work in the Criminal Investigation Department (CID).  Furthermore, he was allowed to work cases even though he had only been an officer for 2 years and had no formal training or investigative skills.  He was advised to leave his weapon at the station when not on duty, but openly displayed his weapon while otherwise on duty.  In comparison, when an African-American officer named Eric Davis was issued a Protective Order, he was treated much differently.  Namely, one of the department's Sergeants was told to drive to Officer Davis' house on the Eastern Shore and relieve Officer Davis of his weapons, as well as his badge and police identification.  Officer Davis was then placed on administrative duty with no police power.

- A white male officer, named Ed Caraballo, was involved in motorcycle crash on I-95 where he drove at a high rate of speed and crashed into a truck.  He was severely injury and was physically unable to perform his duties.  He was charged with riding without proper documentation for his

5

motorcycle, driving an uninsured bike, driving without proper registration and proper driver's license for a motorcycle.  His "sanction" was being permitted by the department to return to work, from Monday – Thursday on 10-hour shifts so that he could be off Friday through Sunday.  He was assigned to the Criminal Investigation Department (CID), Intelligence Unit.

- A white male officer, named Richard Truitt had failed to report to court on several occasions on a major drug case.  He was scolded by the State's Attorney for his lapse and because of his absence the case was dropped.  His "punishment" was a transfer to the department's  Intelligence Unit.  That position provided a take home car that he used to transit to his home in Calvert County, Maryland (45 miles away from the police department).  The position also afforded him overtime pay opportunities.

- A white female officer, named Beth Nelson, was detailed to the Office of the Internal Affairs in February 2011, while having no experience as an investigator.   Instead, she received training after the fact.   African American officers were not offered similar opportunities or circumstances.

- A white male officer, Major Scott Baker, utilized the Department's email to make inappropriate comments of a sexual nature regarding females assigned to the Communications unit and was not sanctioned for his conduct.

- A white male officer, Captain Scott Williams, made inappropriate sexual comments to subordinates, which caused a female officer to seek a transfer from his unit and he was not sanctioned for his conduct.

- For committing infractions, African American officers have been assigned to the Department's CCTV camera room.  In comparison, a white male officer, named James Salyers, who caused a fatal crash while drunk was assigned to the Crime Lab for daily duty.  At the time of his accident, he had only been with the department for two months.  He was permitted to work for 11 months at full pay, while on probation.  He was never asked to work the CCTV camera room, and had no formal training in Crime Lab procedures.  Whereas, after months of being assigned to the camera room, Plaintiff Officer White was assigned to the Crime Lab, but only after Officer Salyers had been released from the department because he had been charged with 10 counts of criminal conduct, to include manslaughter.

### III.   GENERAL ALLEGATIONS

**A.   Officer Shelly C. White, Jr.**

16.    Officer Shelley C. White Jr. had been a sworn police officer for roughly 20 with the Annapolis Police Department.  He has a Bachelor's Degree in Public Administration and Management.  Officer White completed both the Anne Arundel County Police Academy and Correctional Officers Academy and the Criminal Investigation School.  He has been a consultant for HUD's Drug Elimination Technical Assistance Program since 2000.  He was assigned to various police units during his employment with the Annapolis Police Department which

included: Community Services Section as the Training, Public Relations, and Public Information Officer and Criminal Investigation Section as a Detective.  He was hand selected by the Housing Authority of the City of Annapolis as the Director of Operations and Investigations for their Safe Communities Program which he directed for over eleven years in secondary employment capacity.  He also provided technical assistance to various private corporations, private and public housing development and resident groups, to include Alpha Property Management, Inc., Kunta Kinte Celebrations, Inc., McDonalds of Annapolis, Inc., Annapolis Community Partnership, and the Annapolis Planning Action Committee.  He was a Union Shop Steward and Vice President of the FOP.

17.     Officer White was appointed by the Speaker of the House of the State of Maryland to serve on the Board of Directors for the Anne Arundel County Community Action Agency.  Officer White was the Baltimore Sun's Officer of the Year (nominee), after receiving the following awards for his volunteer work in various communities: Dr. Martin Luther King, Jr. Drum Major Award, 2007, the State of Maryland Governor's Citation, Governor's Crime Prevention Award for Law Enforcement Officers, Proclamation by the Mayor of Annapolis "Shelley C. White Jr. Appreciation Day", Maryland Jaycees Outstanding Young Marylander, Maryland Jaycees Outstanding Young Annapolitan, and the Maryland Law Enforcement Officers, Inc.'s Certificate of Merit.  He was cited in numerous news articles for community service awards for his volunteerism and was acknowledged by the States Attorney's Office for his successful conviction rate on numerous high profile cases.

18.     Despite Officer White's history of achievement, he has been denied various promotional opportunities, unlike his non-African American contemporaries in the department.  Moreover, Officer White has been frequently targeted by the department for disciplinary

proceedings due to his participation in the administrative EEO process and vocal opposition to workplace discrimination.  Officer White has been subjected to discipline for minor events and denied advancement opportunities, whereas his white contemporaries have committed far more serious transgressions without repercussions.

19.     The allegations lodged against Officer White after he started speaking out against workplace discrimination and unfair treatment of African-American officers include the following:

- A departmental allegation that Officer White used inappropriate language and conduct in speaking to another police officer.  Officer White declined to accept the disciplinary action and requested an administrative hearing instead.  This administrative hearing was pending for over two and a half years.  Ultimately, the department was forced to drop the charge related to "inappropriate comments" and Officer White was deemed "Exonerated" of that charge.

- The department also disciplined Officer White under the pretext that on approximately three occasions between the months of April 2011 and June 2011, he failed to provide documentation regarding his physical limitations to perform his duties.  It should be noted that after he first filed his EEO complaint, Officer White experienced health failures, partially attributable to work-induced stress and the retaliation that he suffered.  Officer White was suspended pending a fact-finding hearing with respect to this set of charges.  During the administrative Hearing it was revealed that Officer White's commanding officer had failed to

9

submit the documents that Officer White was charged with not having provided.  Accordingly, Officer White was notified that his suspension from duty was withdrawn. Officer White's commanding officer was never charged with making a false statement or failing to provide the documentation.

- The department attempted again to sanction Officer White based upon the allegation alleged that Officer White engaged in a radio transmission with another officer that was unprofessional and that conversation was "possibly" overheard by members of the public.  That particular administrative investigation had being pending for almost two years without resolution.

- The department had also filed an administrative action against Officer White for allegedly having a bad interaction with a member of the public while Officer White was assigned to the department's reception desk. The truth of the matter was that the citizen had become agitated with Officer White when Officer White had declined to provide him with a free copy of an accident report, because doing so would have been contrary to departmental policy.  Undeterred by this fact, and the fact that there was a witness to the event who observed no wrongdoing on Officer White's part, the department pressed forward with its charges and investigation against Officer White, and ultimately used this event to terminate Officer White.

20.     In January 2013, the Department recommended Officer White's termination on the basis of the above-cited "infractions."

**B.     Officer Carl Bouie**

21.     Officer Carl Bouie became a Police Officer with the Annapolis Police Department on March 12, 1993.  He served for over 20 years before being abruptly discharged on March 13, 2013.  Officer Bouie is a military veteran who served as a Sergeant in the U.S. Army for seven years, which included four years of Foreign Service and where he received training at several non-commissioned officer academies for professional development.   Officer Bouie completed the Anne Arundel County Police Academy.  As a police officer with Annapolis City, he served as a D.A.R.E Officer, and Patrol Officer.  He attended a variety of training schools; Psychology of Survival Course, Anne Arundel County SWAT School, D.A.R.E Academy, Field Officer Evaluation Training Program, Maryland Emergency Management PIO Academy, Media Relations Course for Law Enforcement, Maryland Community Crime Prevention Institute, and the National School Resource Officer Course.  Officer Bouie has been awarded the following awards and citations: US Senator Barbara Mikulski Citation, National Association of Town Watch Award (three years), U.S. Department of Justice Child Safe Program Award, Sandy Springs Bank Community Champion Award, Governor's Citation Award, Senate of  Maryland Citation Award, NAACP Outstanding Service Award and the City of Annapolis Citation of Merit.

22.     Despite Officer Bouie's years of exemplary services and consistently competitive promotional testing scores, he was denied promotion opportunities.  Since 2008, Officer Bouie has scored among the top test-takers within the Department for promotional opportunities. However, after each testing opportunity, Officer Bouie was denied a promotion.

23.     For instance, in 2008, Officer Bouie was the only African American in position to be promoted after taking the promotion exam.  Officer Bouie was tied for fifth place overall amongst all test-takers.  The fellow officer who was tied with Officer Bouie for fifth place was a white female officer who had less seniority and less experience than Officer Bouie.  Despite this disparity, Officer Bouie was bumped downward to sixth place overall and the department elected to only promote five officers (four white males and the one white female).  The department then abruptly closed the promotion process thereby denying Officer Bouie that promotion opportunity.

24.     As a result of the 2009 promotion exam, Officer Bouie finished in third place amongst all test-takers on the written exam, and fifth place after the oral board exam.  He was once again the only African-American officer in a position to be promoted.  Following the posting of the scores, complaints regarding the test by test-takers resulted in the department's recalibration of test scores.  Incredibly, this resulted in Officer Bouie dropping from third place on the written exam to fifteenth!  Officer Bouie's plummet in the standings was especially suspect given the fact that he was maxed out in seniority and had achieved a score of 37 out of 40 on the oral board exam component of the promotion exam.  Additionally curious was the fact that many of the white officers who had initially failed the 2009 exam were then promoted after the department's recalibration.  When Officer Bouie questioned these results to his superiors, he was informed that the department decision was "final".

25.     Undeterred, Officer Bouie tested again later in 2009 for a promotion.  Not surprisingly, Officer Bouie scored highly again, placing in a tie for fifth place amongst all test takers.  Again, Officer Bouie was the only African-American officer eligible and in a position to

be promoted as a result of the promotional testing.   Yet again, Officer Bouie was denied a promotion.

In June 2009, the Department promoted four white male officers from the 2009 promotion list.  In October 2009, the Department promoted the white male officer who was tied with Officer Bouie as the fifth top test taker.  Despite the fact that it had been announced that there were seven (7) promotion opportunities at the time, the department again declined to promote Officer Bouie.

26.     Since joining the Department 20 years ago, despite his consistently competitive testing results, Officer Bouie has observed six of his contemporaries who are white officers achieve promotions while his career has languished absent similar opportunity.

27.     In July 2009, Officer Bouie voiced his concern to his immediate supervisor, Sergeant Karen Faulkner, of being denied the opportunity to train new recruits as the senior officer on his shift.   Officer Bouie had previously noted this inequity through the grievance process, protesting the fact that he should be permitted to serve as a Field Training Officer, given the fact that he had attended FTO training and successfully completed the course of study in February 1998.  Officer Bouie's request was rejected, whereas the department permitted other uncertified and less experienced non African American officers to conduct field training of new recruits.  It should be noted that the ability to serve as a Field Training Officer resulted in cash compensation, an opportunity denied to Officer Bouie.

28.     In January 2011, the department's Internal Affairs Division advised Officer Bouie that its "Early Identification System" had been activated against him because he had two or more "sustained" complaints within a 12-month period.  One of the complaints related to an event on July 30, 2010, which Officer Bouie disputed by requesting a written explanation of the basis for

that particular complaint.  The department did not respond to Officer Bouie's request.  Officer Bouie also questioned a July 7, 2010, complaint where he was reprimanded for "failure to secure property" in light of the fact that other non African American officers had committed the same infraction, but not punished.

29.     After Officer Bouie voiced his opposition to the unfair employment practices that resulted in his not being promoted, he was singled out for harsh discipline for inconsequential matters, retaliation and was ultimately terminated from his employment.

30.     To that point, in April 2012 after returning from sick leave due to an eye injury, Officer Bouie was greeted with several administrative charges and notification from the department that he was being investigated for "misconduct."  The charges against Officer Bouie related to the following alleged "infractions:"

- In March 2012, for allegedly washing his private vehicle several minutes before his shift ended and being out of uniform.

- In March 2012, for failure to assist an officer.

- In April 2012, Officer Bouie for "unprofessional conduct" because he was allegedly seen walking a public foot trail at the United States Naval Academy with Officer White.

31.     While the above-cited complaints were presumably being processed, the department made attempts to obtain surveillance video of Officer Bouie and Officer White while they were engaged in private conversation in the general public.  Upon information and belief, the department has never gone to such lengths to garner evidence in an administrative action against non-African American officers for minor transgressions.

32.     As a result of these charges, in March 2013, Officer Bouie was terminated from his employment.

### C.     Sergeant James Spearman

33.     Sergeant James Spearman is one of the most senior members of the Annapolis Police Department.  During his twenty seven (27) years of dedicated service he has also become one of its most highly decorated members.  He has been recognized for acts of bravery, heroism, crime prevention, and community service by the Governor's Office, Mayor's Office, the community and the agency itself.  He is a graduate of the Baltimore County Police Academy and Leadership Anne Arundel.  As a member of the department, he has served on the Governor's Office on Crime Control and Prevention as a Hot Spot Team Leader.  He has also served as the Chairman on the Board for Awards and Commendation Committee and has also served as a Victim Witness Assistance Domestic Violence Advocate through YWCA.  Prior to becoming a Sergeant he was a Firearms Instructor and Field Training Officer.  In addition to supervising a Patrol Midnight Squad he is a member of the department's Crisis Negotiation Team.  Sergeant Spearman is also one of the most popular officers within the City of Annapolis. He is widely recognized in the community and relied upon to settle disputes or provide guidance to the enhancement of the quality of life of the citizens that he serves.  Sergeant  Spearman currently volunteers as a member of the Anne Arundel County Black Caucus.

34.     In October 2011, Sergeant Spearman was informed by his supervisor that an anonymous person (presumably another officer), had alleged he had engaged in dereliction of duty.  Sergeant Spearman was further informed of the following particulars of the complaint by someone assigned to the Internal Affairs Division:

    a)  That Sergeant Spearman went to his residence to sleep while on duty;

    b)   That he failed to be available to officers when needed;

    c)   That he often would "disappear" when the Supervisor was not working or had left for the night; and

    d)   That he failed to maintain contact with officers

35.    These allegations against Sergeant Spearmen were false and he was informed by Internal Affairs that it was not believed that there was any merit to the complaint.  However, he was being informed as a courtesy.

36.    Throughout Sergeant Spearman's over 26 years of duty, he had never been the subject of any investigation; formal or informal.  As a means of restoring his honor, Sergeant Spearman requested that the matter be thoroughly investigated.  Internal Affairs refused to investigate the matter any further.

37.    In October 2011, Sergeant Spearman received an email from the Chief of Police, Michael Pristoop, requesting that Sergeant Spearman see him in his office.  On October 28, 2011, Sergeant Spearman met with Chief Pristoop.  Chief Pristoop began the meeting by stating his faith in Sergeant Spearman and that he should not worry about the aforesaid complaint lodged against him with Internal Affairs and that no charges would be filed against him.  Chief Pristoop then went on to prod Sergeant Spearman to disclose what he knew about the pending EEO complaints filed by other African American officers.  Sergeant Spearman declined to offer commentary regarding those complaints.  Upon information and belief, the singular purpose of the meeting with Sergeant Spearman was not to resolve the anonymous complaint lodged against him, but to intimate and harass him to the point that he would disclose his confidential communications with other African American officers who had filed administrative complaints against the department.

38.     In October 2011, Sergeant Spearman lodged an internal EEO complaint alleging that he was being harassed and discriminated against in the workplace.

39.     In February 2012, Sergeant Spearman filed an administrative charge with the EEOC alleging unfair treatment and workplace discrimination.

40.     In November 2012, Sergeant Spearman participated in a Fact Finding Conference with the EEOC.

41.     In December 2012, the department notified Sergeant Spearman that he was under investigation for an incident that allegedly occurred in May 2010.   The allegation against Sergeant Spearman was that he had failed to report an incident wherein another officer had mistreated a prisoner.   That alleged "failure to report" from several years prior is the basis for the department's currently pending disciplinary proceeding against Sergeant Spearman.

42.     Upon information and belief, the department's present disciplinary action against Sergeant Spearman is designed solely to retaliate against him for his participation in the EEOC process and opposition to the department's discriminatory workplace practices.

**D.      Officer Floyd Carson, Jr.**

43.     Officer Floyd Carson, Jr. is a former officer with the Annapolis Police Department.   Officer Carson became a police officer with Annapolis on April 15, 1998.   He served for 13 years and was medically retired in November 2011.   Officer Carson is a military veteran who served with the 82nd Airborne Division of the U.S. Army from 1988 – 1992 where he was a member of the Cavalry Scout and participated in Operation Desert Shield and Desert Storm.   As a member of the military he received the Army Achievement Medal, Good Conduct Medal and the National Defense Ribbon with two Bronze Stars.   Officer Carson has a Bachelor's Degree in Criminal Justice Sociology.   As a police officer with Annapolis City, he served in a

variety of positions to include: Street Level Drug Enforcement Officer for three years, Detective in Crimes Against Person for two years, Field Training Officer and Intoxi-Meter Operator.  He was recognized as Employee of the Year in 2006 and Employee of the Month in 2008 and 2010.  He was awarded the M.A.D.D. Outstanding DUI Enforcement Award, State of Maryland Governor's Citation (3 awards), Community Service (2 awards), Water Rescue, 2009 Baltimore Sun's Officer of the Year (Nominee).

44.    On March 25, 2010 while working foot patrol Officer Carson recognized a suspect with an open armed robbery warrant.  The suspect fled and Officer Carson gave chase.  During the chase, Officer Carson felt a sharp pain in his right knee.  He apprehended the suspect and filed a report of injury.  Officer Carson did not seek immediate medical attention. However, several days later, he went to an Orthopedic Specialist who diagnosed his injury as a knee sprain.  Officer Carson continued performing his duties as a foot patrol officer but the pain became unbearable, so he returned to the Orthopedic Specialist who ordered an MRI.  The MRI revealed that Officer Carson had a badly damaged Patella Tendon.  The doctor immediately ordered him to light duty for 12 weeks of physical therapy.  Officer Carson remained on the day shift in a light duty capacity working in the Communications Room and front desk areas under the supervision of a female Captain.   Shortly thereafter, an Acting Captain was assigned as Commander of the Community Service Unit.  This is when Officer Carson began getting degrading assignments such as making trash cans and recycling bins and constantly changed his work schedule where he was ordered to work 4 days on and 2 days off, then 4 days on and 4 days off.   This not only interfered with Officer Carson's physical therapy appointments, it also interfered with his scheduled court appearances.

45.     Officer Carson tried to get the City's Human Resources Department to help him resolve his issues with the department.  He filed his original human resources complaint with the City of Annapolis on February 10, 2011.  Officer Carson personally took his written complaint to the Director of the Human Resources Department.

46.     On March 3, 2011, after several weeks of not hearing from anyone from human resources, Officer Carson visited the Human Resources Director in his office to check the status of his case.  The Director told Officer Carson that he would look into it.  Immediately after Officer Carson hand delivered a copy of his complaint to human resources, the City Manager called the previous Chief of Police who is retired and asked him about Officer Carson's creditability.  Upon information and belief, this particular tactic was unique and not the norm, at least with respect to non African American officers.  Although the City Manager called the former Chief, the HR Director and City Manager they took no action to resolve Officer Carson's complaint.

47.     Officer Carson waited another month until roughly April 4, 2011, but he still did not hear from anyone from the City about the progress of his case.  On April 4, 2011, Officer Carson called the Human Resources Director again and was told that he had not done anything with Officer Carson's case and tried to schedule a meeting with him.  Officer Carson told the Director that he had waited over two months for him to just attempt to schedule a meeting and that he would be filing an EEOC complaint to ensure that he got a fair chance to address the issues of workplace discrimination and mistreatment.

48.     On May 12, 2011, Officer Carson met with his physician who advised him that he would be releasing him to full duty on May 23, 2011.  Officer Carson immediately sent an email to the Chief of Police requesting that he be promptly returned to his original chain of command.

Officer Carson sent the email to Chief Pristoop because the Chief is the person who has to reinstate an officer back to full police power.

It was explained to Officer Carson by the Sergeant in charge of weapons qualification that he needed to re-qualify for the yearly weapons qualification prior to being reissued his service weapon.  Per the General Orders, when a Police Officer is on light duty, his/her police power is suspended until he/she returns to full duty.  Officer Carson requested that his work hours be changed to either 10:00a.m – 6:00p.m or 12:00p.m – 8:00p.m, in part, so that he could re-qualify with his service weapon.  His request was denied.  Instead, Officer Carson's hours were switched to 5p.m to 1a.m. Tuesday to Saturday, despite the additional fact that he had provided documentation that his physical therapy appointments were at 11a.m. in the morning. Upon information and belief, other non African American officers were permitted more flexible schedules to accommodate things such as physical therapy sessions while assigned to light duty.

49.     During his light duty assignment, Officer Carson was assigned to clean up the property/equipment room.  The Acting Captain came down to the property room and looked in the direction of Officer Carson and then looked at the other officers who were talking with Officer Carson, smiled and asked "Do you know where the janitor is"?  This comment was intended to further disparage and humiliate Officer Carson.  Upon information and belief, non African American officers were not required to function as janitors while assigned to light duty status.

### IV.    COUNTS

### COUNT I
### (TITLE VII – RACIAL DISCRIMINATION, HARASSMENT AND HOSTILE WORK ENVIRONMENT)

50.     Plaintiffs hereby incorporate paragraphs 1 – 49 as though fully set forth herein.

51.     The acts of Defendant and its agents amount to racial discrimination, harassment and created a hostile work environment.  Defendant has ratified the improper conduct by its failure and/or refusal to remedy the situation.

52.     As a result of Defendant's conduct, Plaintiffs have sustained emotional and mental distress, anxiety and medical expenses, and other tangible and intangible damages.

53.     Plaintiffs' immediate supervisors were aware of Plaintiffs' distress and their susceptibility to it, and they not only failed to address the afore-described workplace issues in which Plaintiffs were placed but Defendant was, in large measure, responsible for it.

54.     Under the circumstances, Defendant's actions were willful and malicious, entitling Plaintiffs to punitive damages.

## COUNT II
## (TITLE VII – RETALIATION)

55.     Plaintiffs hereby incorporate paragraphs 1 – 54  as though fully set forth herein.

56.     The acts of Defendant and their agents amount to retaliation.  Defendant has ratified the improper conduct by its failure and/or refusal to remedy the situation.

57.     Under the circumstances, Defendant's actions were willful and malicious, entitling Plaintiffs to punitive damages.

## **JURY DEMAND**

58.     Plaintiffs hereby demand a trial by jury in this action, pursuant to Fed.R.Civ.P., Rule 38b, on all issues of fact and damages arising hereunder.

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendant and requests that this Court:

(a)     Declare that the acts and practices complained of herein are in violation

         of Title VII;

(b)     Enjoin and permanently restrain the violations of Title VII;

(c)     Direct Defendant to take such affirmative action as is necessary to

         ensure that the effects of these unlawful employment practices are

         eliminated and do not continue to affect Plaintiff's employment

         opportunities;

(d)     Award Plaintiffs compensatory and punitive damages;

(e)     Award Plaintiffs the costs of this action, together with reasonable

         attorney's fees as provided by Title VII;

(f)      Direct Defendant to pay punitive damages for its conduct; and

(g)     Grant such other and further relief as the Court deems just and

         necessary.




                                     _____/s/_____
                                     Neil E. Duke (Federal Bar No.: 14073)
                                     Ober, Kaler, Grimes & Shriver
                                     A Professional Corporation
                                     100 Light Street
                                     Baltimore, MD  21202-1643
                                     (410) 685-1120
                                     (410) 547-0699 - Fax

                                     Attorney for Plaintiffs


Dated:  May 6, 2013