IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| SHELLEY C. WHITE, Jr., et al, | * | |
| | * | |
| v. | * | Civil No. JFM-13-1330 |
| | * | |
| CITY OF ANNAPOLIS (MD) | * | |
| | * | |

\*\*\*\*\*\*

## MEMORANDUM

Plaintiffs Shelley C. White, Jr., Carl Bouie, James Spearman, Jr., and Floyd Carson, Jr. (collectively "plaintiffs") bring this lawsuit against the City of Annapolis, Maryland ("the City"), claiming it violated Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq*. Plaintiffs are current and former police officers with the City of Annapolis Police Department ("APD") and seek monetary relief for alleged racial discrimination and retaliation.

Now pending is a motion for summary judgment filed by the City. (ECF No. 63). It is fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons set forth below, the motion is granted.

## BACKGROUND

The undisputed facts pertaining to each plaintiff are detailed below. I have limited the pertinent facts to those alleged in plaintiffs' amended complaint and substantiated by evidence or conceded by the City. [1]

---

[1] Plaintiffs argue that because the City failed to respond to the First Request for Admission of Documents within the thirty day period prescribed by Federal Rule of Civil Procedure 36, those facts should be deemed admitted. (ECF No. 74 at pp. 15–17). I disagree. Rule 36(a)(3) also allows for a longer time to respond upon order of the court. That is precisely what occurred here—I denied plaintiffs' motion for default judgment (ECF No. 48), and held a status conference to set a new discovery deadline, which the City complied with. (ECF No. 51).

## I.    Shelley White.

Plaintiff White, now deceased, was employed by the APD for about twenty years.  White became Director of the Juvenile Offenders in Need of Supervision ("JOINS") program in February 2010, a program within the APD's Community Service Section.  Subsequent to White becoming Program Director, Lt. Brian Della was named Acting Captain of the division including the JOINS program.  Della was responsible for removing White as Program Director in April 2011 and reassigning him to be a Troubleshooting Officer who addressed community complaints and conducted foot patrols.  White presented his supervisor, Sgt. Jessica Kirchner, with a doctor's note that explained White's health issues and recommended he not be assigned to foot patrols.  The parties dispute how this issue was handled—the APD claims that the doctor's note and White's accommodation request were vague and so he was reassigned to administrative duty under Captain Cynthia Howard.  White, however, asserts that his "efforts to secure a reasonable work schedule  . . . were unsuccessful."  (ECF No. 74 at p. 4).  White filed an administrative charge with the EEOC on March 14, 2011 and another on May 12, 2011, alleging disparate treatment because of his race "with respect to assignments and work schedule changes."  (ECF Nos. 65-3, 4).[2]  White filed an amended charge on January 25, 2012.  (ECF No. 65-5).  The EEOC issued a Dismissal and Right-to-Sue notice on January 31, 2013.  (ECF No. 65-7).

While White was on administrative duty because of his medical issues, he was stationed at the reception desk in the lobby on July 9, 2012.  (ECF No. 65-6).  According to a reprimand issued by the APD and a subsequent investigation by Sgt. Elizabeth Nelson in Internal Affairs, White "was discourteous" to a citizen who asked to pick up a police report, and White later "provided false information" to Nelson that implicated co-plaintiff Carl Bouie, described below.

---

[2] White and all other plaintiffs also filed charges with the Maryland Commission on Human Relations ("MCCR").

*Id.* After the investigation was concluded, the APD terminated White's employment effective February 26, 2013. (ECF No. 65-8). White alleges other retaliation incidents that occurred prior to the "lobby incident," but they will be discussed further below.

## II.   Carl Bouie.

Plaintiff Bouie was also employed by the APD for about twenty years, and was an Officer First Class from March 1993 through his termination. Bouie filed an administrative charge with the EEOC on December 3, 2010, alleging disparate treatment based on his race in the form of a denied promotion, and also disparate discipline regarding a written reprimand for improperly tagging evidence. (ECF No. 65-10). Bouie claimed that four similarly-situated white employees were promoted to Corporal while he was not, and also claims that a similarly-situated white employee was not issued a written reprimand for a similar improper-tagging of evidence event. *Id.* The EEOC issued a Dismissal and Right-to-Sue notice on January 31, 2013. (ECF No. 65-12).

Bouie alleges that after he filed his EEOC charge, "he was denied certain opportunities," including Della's refusal to allow Bouie to exercise "field training responsibilities," where he had previously trained new officers. (ECF No. 74-2 at 46:21–48). Bouie also become involved with White and the "lobby incident." Both officers claimed that Bouie was present throughout White's altercation with the citizen, and Bouie provided testimony absolving White of any misconduct. Nelson, however, who conducted the investigation, concluded that Bouie provided false information because he was not present in the lobby during the incident. Accordingly, the APD terminated his employment effective March 13, 2013. (ECF No. 65-13).

### III.    James Spearman.

Plaintiff Spearman's career with the APD began in February 1986 and he was promoted to Sergeant in October 2009.  Beginning in October 2011, Spearman's supervisor Lt. Brian Antal informed him that anonymous allegations had been leveled against Spearman, claiming that he committed dereliction of duty by sleeping, failing to be available, and "disappearing" when Antal was away.  Neither Antal or Nelson (of Internal Affairs) believed those allegations, so no investigation occurred.  The Chief of Police—Michael Pristoop—asked to meet with Spearman, a meeting which Spearman thought would involve the lack of African-Americans in leadership positions at the ADP.  Instead, Spearman claims that Pristoop discussed Della and "race issues" with Spearman.  (ECF No. 65-16).  Spearman began the EEOC charge process the next day, alleging harassment and intimidation, which culminated in a formal charge on February 28, 2012.  *Id.*  Spearman claims more generally that he became a target because of his friendship with White and Bouie, who were under investigation in the fall of 2012 for the "lobby incident." The EEOC issued a Dismissal and Right-to-Sue notice on July 30, 2013.  (ECF No. 65-17).

### IV.    Floyd Carson.

Plaintiff Carson began working for the APD in April 1998.  Carson was injured in the line of duty in March 2010, and was placed on light duty pending his eventual medical retirement.  Carson initially received light duty assignments from Captain Cynthia Howard, but in July 2010 then-Acting Captain Della began supervising Carson.  Carson alleges that Della changed Carson's work schedule and assigned him "demeaning assignments" such as janitorial duties, and that Carson became "*persona non grata*."  (ECF No. 74 at p. 12).  Carson filed an administrative charge with the EEOC on June 21, 2011.  (ECF No. 65-18).  Due to further injuries sustained by Carson, he was medically retired effective November 1, 2011.  (ECF No.

65-19).  The EEOC issued a Dismissal and Right-to-Sue notice on January 31, 2013.  (ECF No.

65-20).

## STANDARD

### I.      Summary Judgment.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party*

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

673 F.3d 323, 330 (4th Cir. 2012)), *cert. denied*, 134 S. Ct. 681 (2013).  "A fact is material if it

'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48.  The court must view the

evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861,

1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor.  *Scott v.*

*Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of*

*the Courts*, 780 F.3d 562 (4th Cir. 2015).  At the same time, the court must "prevent factually

unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football*

*Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79

(4th Cir. 2003)).

## II.     Applicable Title VII Law.

Title VII prohibits employers from discriminating against an "individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).   A plaintiff can meet his burden of proof through introducing direct or circumstantial evidence, or through the *McDonnell-Douglas* burden-shifting framework. *See, e.g.*, *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Here, plaintiffs rely on the *McDonnell Douglas* framework to oppose the City's motion for summary judgment. The specific elements of that framework are described below regarding each type of claim.

### A.   Exhaustion.

First, all Title VII claims (regardless of the method of proof chosen by a plaintiff) must initially be filed as a charge with the federal Equal Employment Opportunity Commission ("EEOC") "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).  That statutory period is extended in "deferral states" where a plaintiff files a charge or complaint with the relevant state anti-employment discrimination agency. *E.g.*, *Williams v. Giant Foods, Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). Because Maryland is such a "deferral state," plaintiffs have a maximum of 300 days to file a charge with the EEOC after a discriminatory act occurs. *Id.*

If the EEOC dismisses the charge and issues a right-to-sue notice, the scope of the plaintiff's civil lawsuit is limited by the content of the EEOC charge. *See, e.g.*, *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300–01 (4th Cir. 2009) (noting that only claims "stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint" can be brought) (quoting *Evans v. Techs. Apps. & Serv.*

6

*Co.*, 80 F.3d 954, 963 (4th Cir. 1996)).  An illustration of this is where the administrative charge "alleges one type of discrimination—such as discriminatory failure to promote—and the [civil] claim encompasses another type—such as discrimination in pay and benefits." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005).

### B.  Disparate Treatment.

Racial disparate treatment claims require proving that the employer intentionally discriminated against a plaintiff because of his race.  A plaintiff can meet that burden by relying on the *McDonnell Douglas* framework, in which he first establishes a prima facie case.  The first element is always that the plaintiff was a member of a protected class.  *See, e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005).  The other elements depend on the type of claim asserted.  For example, a plaintiff alleging disparate discipline must also establish that: (2) the prohibited conduct is comparable to that of employees outside the protected class; but that (3) the plaintiff suffered more severe consequences than those employees despite comparable conduct. *See, e.g.*, *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 510 (4th Cir. 1993).  A failure-to-promote claim requires a plaintiff to further allege that he: (2) applied for the position in question; (3) for which he was qualified; and (4) was nonetheless "rejected . . . under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998).

Although the prima facie standard is low, *see, e.g.*, *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 536 (4th Cir. 1990), plaintiffs must sufficiently prove each element.  For example, a plaintiff alleging disparate discipline must establish that the adverse employment action he suffered constituted a "significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Moreover, the prohibited conduct of the plaintiff must be sufficiently similar to that of an employee outside the protected class "to permit a sound comparison between the discipline imposed." *Artis v. U.S. Foodservice, Inc.*, Civil No. ELH-11-3406, 2014 WL 640848, at *8 (D. Md. Feb. 18, 2014).

After the plaintiff establishes a prima facie case, the burden of production shifts to the employer, whom must proffer a legitimate, non-discriminatory rationale that explains the adverse employment action. *See, e.g.*, *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Once the employer cites that reason, the burden shifts back to the plaintiff who must prove by a preponderance of the evidence that the employer's proffered rationale is merely "a pretext for discrimination." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)). Apart from burden-shifting, however, the core question always remains "whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

### C. Hostile Work Environment.

A plaintiff alleging a hostile work environment based on race must demonstrate that the conduct was: (1) unwelcome; (2) based on race; (3) "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (citation omitted). Most disputes often focus on the third element, because the abusive work environment must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (noting that the environment is "judged from the perspective of a reasonable person in the plaintiffs' position"). Although not

a "mathematically precise test," courts look to "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance,"

among others.  *Harris*, 510 U.S. at 23.  When there are multiple plaintiffs but their lawsuit is not

a class action, "the hostile work environment claim of each plaintiff must be considered on its

own individual merits."  *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 474 (4th Cir. 2002).

Related to the exhaustion requirement outlined above, discrete acts of discrimination—

such as failure to promote and retaliatory demotion—"are clearly not allegations of a hostile

work environment."  *Chacko*, 429 F.3d at 511 n.2 (citing *Evans v. Techs. Apps. & Serv. Co.*, 80

F.3d 954, 963 (4th Cir. 1996) (holding that plaintiff's sexual harassment and discrimination in

pay and benefits claims were barred because her EEOC charge only alleged a failure to

promote)).  It is difficult, therefore, for a plaintiff to file a charge for disparate treatment and later

cite those incidents as establishing a hostile work environment in a subsequent civil lawsuit.

### D.  Retaliation.

Finally, a plaintiff alleging retaliation in violation of Title VII must prove that he: (1)

engaged in protected activity; (2) suffered a materially adverse employment action from his

employer; and (3) there is a causal connection between the two.  *See, e.g.*, *Holland v. Wash.

Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).  "Protected activity" encompasses employees

who "made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing."  42 U.S.C. § 2000e-3(a).  As for what constitutes a "materially adverse

employment action," the action must be one that would "have dissuaded a reasonable worker

from making or supporting a charge of discrimination."  *Burlington Northern and Santa Fe Ry.

Co. v. White*, 548 U.S. 53, 60 (2006) (internal quotation marks omitted).  Courts have held that

the following do *not* constitute materially adverse employment actions—"moving an employee

to an inferior office . . . issuing a . . . verbal reprimand, a formal letter of reprimand, or a proposed termination." *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013). Actual termination or even constructive discharge, however, are clearly sufficiently adverse. *See id.*

The third element requires the plaintiff to prove a causal connection between his protected activity and the employer's materially adverse action. Temporal proximity is one method by which a plaintiff can prove this element. Obviously the closer in time between the protected activity and adverse action, the stronger the inference of causality. *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). The Fourth Circuit has held, however, that a duration of even three to four months was too long to establish causation when it was the only evidence of causation. *Pascual v. Lowe's Home Ctrs. Inc.*, 193 F. App'x 229, 233–34 (4th Cir. 2006). *But see King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (holding that while a two-and-a-half month gap "weaken[s] significantly the inference of causation," it did not preclude the plaintiff from proving causation). If the plaintiff cites additional evidence of causation, however, a longer temporal duration does not necessarily defeat plaintiff's claim. *See, e.g.*, *Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 881 (D. Md. 2012) ("To be sure, plaintiffs may state a prima facie case of causation by relying on evidence other than, or in addition to, temporal proximity where such evidence is probative of causation."); *see also Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) ("Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation.").

Finally, in contrast to racial discrimination claims, which permit a plaintiff to recover even when the employer's motivation included both lawful rationales and unlawful

discrimination, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action [retaliation] by the employer." *Univ. of Tx. Southwestern Med. Cntr. v. Nassar*, 133 S. Ct. 2517, 2532–33 (2013). The *Nassar* court, however, addressed a plaintiff proffering direct evidence of retaliation—not the *McDonnell Douglas* framework. *Foster*, 787 F.3d at 250–52. After reviewing the purpose and elements of that framework, the Fourth Circuit held that because a plaintiff has always had to demonstrate "at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action," *id.* at 252, *Nassar* did "not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim." *Id.*

## ANALYSIS

Plaintiffs' various individual Title VII claims are addressed in turn below. Generally, all suffer from the same fatal defect—the lack of admissible evidence that establishes plaintiffs' prima facie cases or genuinely disputes the City's proffered non-discriminatory rationales for its actions. Plaintiffs, therefore, cannot meet their burden in opposing the City's motion for summary judgment or ultimately persuade a reasonable jury to find in their favor. Accordingly, the City's motion is granted.

## I.   White's Claims.

### A.  Exhaustion.

The City first argues that I lack subject matter jurisdiction over two of White's claims— failure to promote and hostile work environment—because he failed to properly administratively exhaust them. A plaintiff's civil claim is deemed exhausted if it was explicitly referenced in the EEOC charge, or alternatively "if a reasonable investigation of [the] . . . charge would have uncovered the factual allegations set forth in formal litigation." *Chacko*, 429 F.3d at 512. I

agree with the City as to the failure to promote claim, and dismiss it.  As for White's hostile

work environment claim, I disagree with the City.

White did not exhaust his failure to promote claim.  It is unclear how vigorously White

planned on litigating that claim at trial, for it is only mentioned in passing in the amended

complaint as "[d]espite Officer White's history of achievement, he has been denied various

promotion opportunities, unlike his non-African American contemporaries in the department."

(ECF No. 8 ¶ 19).  Regardless, based on the text of his May 12, 2011 and January 25, 2012

(amended) EEOC charges, White did not adequately allege that the City failed to promote him

based on his race.  In both charges, White discusses the abrupt changes to his work duties and

schedule at the direction of Della, such as his reassignment from the JOINS program "to handle

general public complaints."  (ECF Nos. 65-4, 5).  Not once, however, does White discuss

promotions.  Absent any mention, a reasonable investigation by the EEOC would not have

uncovered facts indicating that such disparate treatment took place.  Because the claim was not

exhausted, it is not properly before this court and is dismissed.

White did, however, exhaust his hostile work environment claim.  There is no clear line

delineating what an EEOC charge must allege in order to encompass this type of claim, and

cases can present a close question.  Courts often start by examining what the plaintiff alleged in

the charge's statement of facts.  Because the essence of a hostile work environment claim is

continual harassment and discrimination, whether the plaintiff checked the "continuing action"

box is relevant.  So too as is whether the plaintiff alleged a "continuous pattern of . . .

misconduct" in the charge.  *Chacko*, 429 F.3d at 512.  Courts also require a plaintiff to allege

more than merely the word "harassment."  *See, e.g.*, *Byington v. NBRS Fin. Bank*, 903 F. Supp.

2d 342, 351 (D. Md. 2012) (holding that even though the plaintiff referenced harassment in her

EEOC charge, it was "void of the specifics necessary to put [the employer] on notice" that its work environment was hostile and, therefore, was not exhausted).

Here, admittedly, White did not explicitly cite harassment or ongoing conduct in his charges. But a plaintiff's claim is also deemed exhausted if a reasonable EEOC investigation would have uncovered facts relating to the claim. *See, e.g.*, *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). Here, the "reasonable investigation" inquiry is not hypothetical—the EEOC explicitly noted that White had alleged retaliation "for engaging in a protected activity with respect to a hostile work environment" in the January 31, 2013 dismissal letter. (ECF No. 65-7) (The "protected activity" referred to is White filing EEOC charges). It is clear, therefore, that the EEOC did investigate whether there was reason to believe White had experienced a hostile work environment.

Moreover, the cases cited by the City are distinguishable on the facts because they often involve a plaintiff attempting to bootstrap a hostile work environment claim on top of a properly exhausted failure to promote claim. *See, e.g.*, *Hejirika v. Md. Div. of Correction*, 264 F. Supp. 2d 341, 346 (D. Md. 2003) ("These charges do not mention instances of harassment or describe a hostile work environment, and instead, quite simply and clearly allege a discriminatory failure to promote."). As described above, White's charges did not mention a failure to promote. Instead, White alleged a series of decisions by Della regarding White's "assignments and work schedule changes." Such a series of incidents could, theoretically, establish a hostile work environment.

Regardless, the question here is not the merits of White's hostile work environment claim but whether it was encompassed by his EEOC charges. Because that claim is reasonably related to what White alleged and was also specifically referenced by the EEOC in its dismissal letter, it was properly exhausted and I have subject matter jurisdiction over it.

13

**B. Disparate Treatment**

White alleges two forms of disparate treatment based on race—he was given worse assignments, and he was not promoted.  The latter claim is dismissed as not properly exhausted.  Addressing the merits of White's disparate treatment claim, it does not withstand the City's motion for summary judgment because White has not adequately pleaded he suffered an adverse employment action, and has not cited a valid comparator who received a less severe action for comparable conduct.

First, a plaintiff can only recover under a disparate treatment claim if the employer's conduct was sufficiently serious as to "adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Holland*, 487 F.3d at 219.  More simply, "there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 737 n.6 (D. Md. 2009).  Here, White cites his assignments while on light duty and his schedule for those assignments as discriminatory based on his race.  The problem, however, is that Della's (and thus by extension the APD's) actions do not constitute  adverse employment actions.  In an analogous context, the Fourth Circuit held that "[t]he mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004).  Being reassigned is only actionable if the plaintiff can cite a "significant detrimental effect," such as a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Id.* (internal citation marks omitted).

Here, however, White has not cited admissible facts which would allow a reasonable jury to conclude that his assignments had a "detrimental effect" on his employment.  White was reassigned from the JOINS program in April 2011, but has not alleged that the terms or

conditions of his employment suffered.  While he was on foot patrol he submitted a doctor's note that recommended he be removed from that type of work.  He was then reassigned to administrative duty where he performed a variety of tasks (first under Captain Howard and later Acting Captain Della), which culminated in his placement at the reception desk in the lobby where the "lobby incident" occurred.  White has not explained whether the different assignments materially affected his salary, job title, or level of responsibility.  He cites Officer James Salyers, a non-African American officer, who was assigned to the crime lab while on light duty, whereas White was assigned to more menial tasks.  Even if Salyers is a valid comparator (discussed immediately below),  "dissatisfaction with work assignments" does not rise to the level of an adverse employment action.  *Cf. Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (holding that the plaintiff's allegations did not sufficiently "prove a constructive discharge").  Even if a crime lab assignment is more desirable, not being assigned to it is not actionable absent evidence that the disparate assignments *also* impacted "the terms, conditions, or benefits" of White's employment.  He has failed to cite such evidence.

Second, even assuming *arguendo* that the disparate assignments were sufficiently serious as to constitute an adverse action, White bears the burden to cite employees outside of his protected class who were similarly situated but received more favorable treatment.  *See, e.g.*, *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).  So-called "comparator evidence" is useful for many reasons, not least of which is that it is considered "more objective in nature."  *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719–20 (4th Cir. 2013).  Under this specific claim, White cites Salyers, a non-African American officer, as a comparator who received more favorable assignments while on light duty.  The problem, however, is that White cites no evidence to support this claim.  White does not establish that Salyers was also on light duty

because of a medical issue, or that his rank and experience was sufficiently similar to White's to permit a sound comparison. In fact, White conceded at his deposition that he had no personal knowledge of Salyers, including why he was on administrative duty. (ECF No. 65-27 at 147:2–148:1). Absent personal knowledge or admissible facts, White has not established that Salyers or any other officer is a valid comparator under his "work assignments" claim. Accordingly, White has failed to plead a prima facie case of disparate treatment and summary judgment in the City's favor on this claim is warranted.[3]

### C. Hostile Work Environment.

Although White properly exhausted his hostile work environment claim, I will grant the City's motion for summary judgment on it. White does not cite admissible evidence necessary to oppose the City's motion for summary judgment and also meet his ultimate burden of persuasion.[4]

Simply put, of the handful of discrete incidents cited by White that could conceivably constitute a hostile work environment, they fail to do so individually or together. White's chief complaint centers around the various work assignments and schedules he was given by Dolla while on light duty, and argues that they were generally unfavorable and assigned to him because of his race. More is required, however, to withstand a motion for summary judgment. Because

---

[3] The parties also discuss the discipline imposed on White after the "lobby incident," in contrast to that of Sgt. Kirchner, an alleged comparable officer. That argument will be addressed with White's retaliation claim below, however, because it may not have been exhausted as a disparate treatment claim. White's amended EEOC charge was filed in January 2012, but the "lobby incident" did not occur until July 2012. That incident, therefore, was not properly within the scope of the charge filed six months earlier. Retaliation claims, in contrast to disparate treatment claims, do not require exhaustion. *See, e.g.*, *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 416–17 (4th Cir. 2014).

[4] Although I will not base my holding on this point, the City is correct to note that plaintiffs failed to respond to its arguments regarding their hostile work environment claims in the response in opposition brief.

the essence of a hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), a plaintiff must allege ongoing and continual conduct rather than discrete and isolated incidents. *See, e.g.*, *Martin v. Napolitano*, Civil No. JKB-13-1962, 2014 WL 1394169, at *3 (D. Md. Apr. 9, 2014) (noting "that the Fourth Circuit has spoken disapprovingly of evaluating a claim of hostile work environment based on allegations of discrete acts of discrimination or retaliation") (citing *Chacko*, 429 F.3d at 511 n.2).

Here, however, the only allegations made by White relate to individual job assignments and schedule changes—discrete incidents that are not of the kind required for a hostile work environment claim. *See Pueschel v. Peters*, 577 F.3d 558, 566 (4th Cir. 2009) (holding that a hostile work environment claim had no merit when the plaintiff relied on "isolated personnel decisions," and had not cited case law demonstrating that such isolated incidents could "be severe or pervasive enough . . . to constitute a hostile work environment") (internal citations omitted); *see also Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 616 (D. Md. 2012) (holding that attempted transfers "amounted to no more than a minor inconvenience," and that "the Court knows of no authority proposing that an undesirable transfer constitutes severe harassment"). Absent allegations of more severe incidents, or a continuous and pervasive environment, White's hostile work environment claim cannot withstand the City's motion for summary judgment.[5]

---

[5] Insofar as White alleges other incidents against different African-American officers to support his claim, the Fourth Circuit has held that the focus must be on the plaintiff's "personal experience." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004).

**D.  Retaliation.**

White's final claim under Title VII is that the City retaliated against him on several

occasions because he filed EEOC charges in May 2011 and January 2012.  As to each of the

alleged retaliatory incidents, however, White fails to establish either that the retaliation was a

materially adverse employment action or that it is causally connected to his protected activity.

Summary judgment on his retaliation claim, therefore, is granted.

White appears to allege four instances of retaliation: (1) an investigation into the use of

inappropriate language; (2) an investigation into speaking in an unprofessional manner; (3)

failure to provide medical documentation; and (4) his termination stemming from the "lobby

incident."  The "protected activity" linked to all four of those incidents is White's filing an

EEOC charge on May 12, 2011, and an amended charge on January 25, 2012.  The first instance,

however—in which White was investigated for allegedly using inappropriate language with

another officer—occurred on May 3, 2010, more than one year *prior* to his protected activity.

The APD's investigation, therefore, could not have been motivated by the EEOC charges.  *See,*

*e.g.*, *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (noting that the

alleged retaliation occurred "*before* [plaintiff's] protected activity, belying the conclusion that a

reasonable factfinder might find that [the employer's] activity was motivated by" that protected

activity).

As for the second and third instances, White fails to sufficiently allege that he suffered

materially adverse employment actions.  Sergeant Nelson in Internal Affairs conducted an

investigation and produced a report which documented an alleged radio transmission from White

to another officer "that was unprofessional and . . . was overheard by a member of the public."

(ECF No. 65-23 at pp. 2–3) (the incident occurred in the presence of CVS employees).  Nelson investigated other similar incidents, and sustained all the allegations against White.  Nonetheless, the file was closed on August 23, 2011 and White was not disciplined—a fact he acknowledges in his deposition.  (ECF No. 65-27 at 164:4–8).  The only action taken against White, therefore, was Nelson's decision to sustain the allegations against White.  That action is not sufficiently serious to constitute a materially adverse action.  *See Wonasue*, 984 F. Supp. 2d at 492 (holding that neither "a verbal reprimand" or a "formal letter of reprimand" were sufficient).

The third instance compels a similar conclusion.  The APD accused White of disobeying an order from his supervisor on three separate occasions to provide more complete medical documentation, and then falsely claimed he had provided a memorandum answering his superior's questions.  (ECF No. 65-24).  Nelson conducted an investigation, sustained the allegations, and closed the case on September 26, 2011.  Once again, no discipline was imposed.  Even if it had been, however, and constituted an adverse employment action, the APD has proffered a legitimate, non-discriminatory rationale for its actions—it enforced and required compliance with the generally applicable Personnel Rules and Regulations of the City of Annapolis.  (ECF No. 65-31).  The Fourth Circuit has held that "[a]n employer may enforce generally applicable employment policies against its employees without creating a cause of action for retaliation."  *Wells v. Gates*, 336 F. App'x 378, 385 (4th Cir. 2009).  To summarize— White was alleged to have failed to provide documentation as required by a generally applicable regulation, an investigation confirmed those allegations, but no discipline was imposed.  White has not cited any facts proving that he was disciplined, or that APD's rationale was pretext.

Finally, the fourth instance.  Although the APD's termination of White's employment is clearly an adverse employment action, White has not sufficiently established a causal link

between his protected activity and subsequent termination.  The first issue is one of timing.

White's latest protected activity was his amended EEOC charge filed on January 25, 2012.  (ECF

No. 65-5).  The APD terminated White, however, effective February 26, 2013—a gap of over

one year.  (ECF No. 65-8).  Neither the Supreme Court or the Fourth Circuit has a set a firm

cutoff on the length of time necessary to establish causation through temporal proximity, but

ample case law suggests that a gap over two to three months, *absent more evidence*, is

insufficient by itself prove a causal link.  *See, e.g.*, *Pascual*, 193 F. App'x at 233–34; *see also*

*Waldrop v. Sci. Applications Int'l Corp.*, Civ. No. AW-10-00328, 2011 WL 4025410, at *6 (D.

Md. Sept. 9, 2011) (five month gap "by itself, is insufficient to support a claim that the events are

causally linked"), *aff'd*, 473 F. App'x 220 (4th Cir. 2012).  Because White has not cited any

evidence other than his own deposition to help prove the causation requirement of his prima

facie case, his case necessarily rests on temporal proximity.  A gap of more than one year defeats

this claim.

Moreover, even if White adequately pleaded a prima facie retaliation case regarding his

termination, White offers no evidence to rebut the APD's legitimate, non-discriminatory

rationale—White was unprofessional and discourteous to a civilian at the police station, and then

made a false statement implicating another officer in an attempt to avoid responsibility.  The

plausibility and reasonableness of that rationale would set a high bar for White to prove pretext;

a bar White has not even attempted to surmount.

In conclusion, summary judgment in the City's favor is warranted on all of White's

claims against it under Title VII.

II.     **Bouie's Claims.**

   A. **Exhaustion.**

The City argues that Plaintiff Bouie's failure to promote and hostile environment claims were not properly exhausted.  Because the content of Bouie's administrative charge and claims are slightly different than White's, a separate analysis is required.  After reviewing the record, I agree with the City and dismiss both claims as lacking subject matter jurisdiction.

First, the failure to promote claim.  Bouie was required to file an administrative claim within 300 days of the alleged discriminatory failure to promote, or at least when he became aware of the denial.  Because Bouie filled out his EEOC intake questionnaire on September 28, 2010, the 300-day window only encompassed discriminatory acts after December 2, 2009.  (ECF No. 65-9).  In his EEOC charge, Bouie claims that he was denied a promotion to corporal on March 31, 2010, within the 300-day window.  (65-10).  The APD disputes that date, however, and argues that the most recent promotion date relative to Bouie filling out the EEOC intake questionnaire was on October 15, 2009, which it proves through an APD document.  (ECF No. 65-33).[6]  Similarly, in the deposition excerpt cited by Bouie, he is discussing his recollections "about the '09 promotion" and does not discuss a 2010 promotion.  (ECF No. 74-2 at 45:11–13).  The only evidence proffered by Bouie that references a promotion in March 2010, therefore, is his allegation in the EEOC charge.  The other white officers he mentions in the charge, however—Becker, Cochran, Lynam, and Sophocles—were indeed all promoted to Corporal, but on June 11, 2009 or October 15, 2009 as noted in the APD document, and *not* in March 2010.  (ECF No. 65-33).  Absent any evidence to dispute the APD's argument that the relevant

---

[6] That set of promotions including co-plaintiff Spearman.

promotion Bouie complains of occurred outside of the 300-day window, his disparate treatment–failure to promote claim was not properly exhausted and is dismissed.

Second, Bouie's hostile work environment claim. Although it was filed within the 300-day period, the allegations asserted by Bouie do not mention, reference, or are sufficiently reasonably related to a claim of a hostile work environment. In contrast to White, Bouie alleged two discrete incidents—a failure to promote, and a single act of disparate discipline and/or retaliation related to improperly tagging evidence. I have previously held that an EEOC charge alleging a discriminatory failure to promote which does "not mention instances of harassment or describe a hostile work environment" means that "[a] reasonable investigation triggered by these charges would not encompass whether a hostile work environment existed." *Hejirika v. Md. Div. of Correction*, 264 F. Supp. 2d 341, 346 (D. Md. 2003). Putting aside Bouie's failure to promote claim, therefore, leaves only the alleged discriminatory and/or retaliatory reprimand claim in the EEOC charge. Once again, however, courts have held that "discrete acts of discrimination . . . are clearly not allegations of a hostile work environment." *Chacko*, 429 F.3d at 511 n.2. Alleging one act of discrimination is quite separate from alleging a work environment "where the harassment is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 777 (D. Md. 2010). Accordingly, Bouie's hostile work environment claim is dismissed.

**B. Disparate Treatment—Discipline.**

Bouie asserts a properly exhausted claim—that he suffered disparate treatment based on his race in the form of more severe discipline for comparable conduct of white officers who received less or no punishment.

On June 10, 2010, Bouie improperly tagged, logged, and stored "evidence from a serious accident." (ECF No. 65-37). As a result, he was issued a letter of reprimand on August 4, 2010. *Id.* By claiming that the discipline imposed was discriminatory, Bouie bears the burden to establish as part of his prima facie case that his misconduct was comparable to that of an employee outside of his protected class who received less severe sanctions. The only mention of a comparable officer, however, is in Bouie's EEOC intake questionnaire and EEOC charge where he cites Michael McDonald as a white male officer who "did not tag evidence and complete the evidence log but was not reprimanded." (ECF No. 65-10 at p. 2). Beyond that allegation, Bouie cites no evidence which establishes that McDonald's misconduct was similar and that his consequences were less severe than those imposed on Bouie. Nor does Bouie even mention McDonald or oppose the City's argument on this issue in plaintiffs' response brief. Absent a valid comparator supported by facts, Bouie cannot establish a prima facie case and the City's motion for summary judgment on his disparate treatment–discipline claim, therefore, is granted. *See, e.g.*, *Artis v. U.S. Foods Serv.*, Civ. No. JKB-13-2870, 2015 WL 1514021, at *4 (D. Md. Apr. 2, 2015) (dismissing plaintiff's disparate discipline claim that was supported only by his "mere speculation" and not "actual evidence of similarly situated employees who were treated differently").

### C. Retaliation.

Like White, Bouie claims that the APD retaliated against him by imposing harsher discipline than would normally be called for and by ultimately terminating his employment for conduct related to the "lobby incident." Once again, because Bouie fails to either plead a prima facie case or cite evidence to rebut the APD's proffered legitimate, non-discriminatory rationale, the City's motion for summary judgment as to Bouie's retaliation claims is granted.

Bouie cites three incidents in which he acknowledges wrongdoing but argues the discipline imposed was retaliatory—ending his shift early, failing to assist an officer, and leaving his post with White.  (ECF Nos. 65-38, 39, 40).[7]  The "discipline" imposed, however, if there was any at all, fails to constitute the level of seriousness required for a prima facie retaliation case.  The APD represents that all three incidents were closed after an investigation "with no disciplinary action enforced against Bouie."  (ECF No. 63-1 at p. 37).  The only action possibly constituting an adverse action is a "Reprimand and Disciplinary Action Report" issued by the APD for Bouie's failure to assist an officer.  Bouie requested a trial board hearing, as was his right, but was terminated for events surrounding the "lobby incident" prior to that board convening.  As described above in Section I. D, *supra*, courts have held it unlikely that the "issuance of a few disciplinary notices would dissuade a reasonable worker from making . . . a charge of discrimination," and, therefore, not actionable as materially adverse employment actions.  *Ashe v. Giant of Md., LLC*, Civ. No. 06-1293, 2007 WL 7020451, at *5 (D. Md. July 17, 2007).

Bouie also cites the same adverse employment action as did White—being terminated after (according to the APD) providing false information to Sgt. Nelson of Internal Affairs.  The same problem arises as to the causality element, however, because of a large gap in time between Bouie's protected activity (filing an EEOC charge) and being terminated.  Bouie filed his charge

---

[7] Bouie also alleges that he was suddenly denied the opportunity to train new recruits and the corresponding monetary compensation without explanation.  It is unclear under which claim Bouie asserts this incident as violating Title VII, but because it is not in his EEOC charge I will address it here as alleged retaliation.  While the loss of compensation is certainly an adverse employment action, Bouie has not cited facts establishing a causal connection.  Even if he were to rely on temporal proximity, no firm dates are provided.  In the amended complaint Bouie alleges that he informally complained to his then-supervisor, Faulkner, in July 2009.  (ECF No. 8 ¶ 28).  In his deposition, however, he places blame solely on Della.  (ECF No. 74-2 at 47:21–25).  Because discovery has closed and Bouie still has not provided even a rudimentary timeline, I hold that his denial-of-training claim must be dismissed.

on December 3, 2010, but was terminated on March 13, 2013, about 27 months later.  This delay

completely severs any plausible temporal proximity to establish causation.  *See, e.g.*, *Clarke v.*

*DynCorp Int'l, LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013).  Bouie does not offer any

additional evidence—direct, circumstantial, or indirect—from which I or a reasonable jury could

infer that his termination was caused by his protected activity and not, as the APD proffers, that

Bouie provided false statements to Nelson as part of her investigation of the "lobby incident"

involving co-plaintiff White.[8]  Absent evidence other than temporal proximity, summary

judgment in the City's favor on this claim is warranted.

In conclusion, all of Bouie's claims are dismissed for procedural or substantive defects

which prevent him from adequately opposing the City's motion for summary judgment.

## III.   Spearman's Claims.

### A.  Hostile Work Environment.

The City argues that summary judgment in their favor of Plaintiff Spearman's hostile

work environment claim is warranted because he fails to allege or substantiate conduct that was

sufficiently "severe or pervasive" to allow a reasonable jury to find in his favor.  I agree.

Spearman cites two incidents that he claims constituted harassment and resulted in a

hostile work environment—the APD's failure to investigate anonymous complaints against

Spearman, and a meeting with Chief Pristoop in October 2011 to discuss why other African-

American officers were filing EEOC complaints against the APD.[9]  First, Spearman was

---

[8] Bouie's own testimony and speculation is insufficient.  *See, e.g.*, *Khoury v. Meserve*, 268 F.
Supp. 2d 600, 615 (D. Md. 2003) ("It is not enough for Plaintiff to allege pretext based on [his]
own view of the truth; in order to rebut Defendant's non-discriminatory reason, Plaintiff's task is
to proffer evidence showing that Defendant's stated reason was not the real reason for its
actions.").

[9] Plaintiffs' response brief cites a portion of Spearman's deposition in which he "offered specific
examples of how institutional racism has shaped the Department . . . That testimony stands

informed on October 16, 2011 that someone had anonymously alleged he was in dereliction of duty by sleeping at his home during his shift, failing to be available when needed, and not maintaining contact with other officers.  Spearman disputed all those allegations, and denied any culpability.  Spearman himself admits that his supervisors and Sgt. Nelson of Internal Affairs agreed with him that the allegations had no merit, as is evidenced by the fact that Spearman was not investigated.  Spearman nonetheless argues, however, that he then asked Nelson to investigate the anonymous complaint "[a]s a means of restoring his [Spearman's] honor."  (ECF No. 8 ¶ 37).  Nelson and the APD declined that request, which Spearman claims was discriminatory.  Spearman, however, proffers no evidence suggesting that decision was motivated by race.  Nor has Spearman sufficiently demonstrated how the decision not to investigate an anonymous complaint—which the APD dismissed as non-meritorious—was "sufficiently severe or pervasive to alter the terms or conditions of [his] employment."  *Pueschel*, 577 F.3d at 565.

Similarly, Spearman claims Chief Pristoop did not meet with Spearman to hear his concerns, but instead to seek feedback on why other African-American officers were alleging racial discrimination.  (ECF No. 65-14).  Spearman acknowledges he wanted to have a conversation with Pristoop about these issues, but was surprised that this meeting was where that conversation took place and was unhappy that Pristoop "spoke to many other junior officers before he spoke with" Spearman.  *Id.*  Even if Pristoop's conduct—which I find facially reasonable based on Spearman's own contemporaneous memorandum—was objectionable, it

---

unchallenged."  (ECF No. 74 at p. 11).  The relevant inquiry, however, is the conduct directed at or directly experienced by Spearman himself.  *See, e.g.*, *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004) ("[Plaintiff] makes much of the treatment of other . . . employees, but we focus on [his] personal experience.").  Moreover, Spearman's testimony relates to personnel decisions made by Pristoop, not "severe and pervasive" racial harassment.  Spearman has not alleged (or exhausted) a failure to promote claim.

comes nowhere close to the kind of "discriminatory intimidation, ridicule, and insult" necessary for a hostile work environment claim. *Harris*, 510 U.S. at 21. Racial epithets and other forms of harassment rise to that level; a conversation with the Chief of Police about racial issues does not. Spearman may have been disappointed and frustrated that Pristoop did not articulate a plan for addressing the concerns of African-American officers, but that incident is not one which gives rise to a hostile work environment claim. Absent other evidence, summary disposition of Spearman's hostile work environment claim is appropriate.

### B. Retaliation.

Spearman also claims that he was retaliated against in December 2012, when the APD informed him that he was being investigated for the failure to report an excessive use of force which occurred in May 2010. Spearman's claim suffers from two flaws: he has not established that he suffered an adverse employment action, nor has he established a causal connection between protected activity and the "discipline" imposed.

First, Internal Affairs investigated Spearman for failing to report the use of force against a prisoner by one of his officers, Ofc. Tomlinson. Spearman was found to have violated one of the General Orders, and was ordered on January 29, 2014 to forfeit twenty hours of leave and have a Letter of Reprimand be placed in his personnel file. (ECF No. 42 at p. 9). Assuming *arguendo* that those two incidents constituted an adverse employment action as required in the second element of a prima facie retaliation claim, the discipline was never actually imposed. (ECF No. 63-1 at p. 42; No. 65-42 at pp. 1–8). Spearman exercised his right to appeal the administrative trial board's decision (against him) to the Circuit Court of Anne Arundel County. The court ruled in Spearman's favor, citing the incomplete record resulting from the mistaken failure to turn on the audio recorder at Spearman's trial board hearing—which Spearman

acknowledges.  (ECF No. 76-3 at 209:11) ("I ultimately won, yes.").  Thus the only permanent, negative outcome for Spearman is that he was administratively found to have violated the relevant General Order after an investigation.  Conducting an investigation into an incident, however, is not by itself an adverse action.  *See, e.g.*, *Porter v. Nat. Con-Serv., Inc.*, 51 F. Supp. 2d 656, 658 (D. Md. 1998) (characterizing "discipline" alone as not the kind of "ultimate employment decision[] such as hiring . . . discharging" required to constitute an adverse employment action).  Here, Spearman suffered no legally sufficient adverse employment action.

Even if he had, Spearman also fails to establish a causal link between his protected activity (filing an EEOC charge) on February 28, 2012 and being notified that was under investigation in December 2012.  That ten-month gap is longer than the Fourth Circuit has been comfortable with as the *sole* basis for establishing causation.  It is also worth noting that because simply investigating an employee is not itself an adverse action, the appropriate date of the adverse action is January 29, 2014, when the investigation was completed and Pristoop informed Spearman of his discipline.[10]  That is almost a two-year gap, once again too long to provide the kind of temporal proximity necessary to solely establish causation.  And, just as with White and Bouie, Spearman fails to introduce or cite other evidence that establishes a causal link.  The City's motion for summary judgment on Spearman's retaliation claim is granted.

IV.   **Carson's Claims.**

   A.  **Disparate Treatment—Work Assignments.**

Plaintiff Carson first alleges that after suffering a knee injury while on duty he was given "degrading assignments" by then-Acting Captain Della.  Carson claims this constitutes disparate

---

[10] Even if the actionable date is when Pristoop decided on the discipline, which would be earlier than when he informed Spearman, it would still be in the fall of 2013 based on when the investigation was concluded.

treatment because non-African American officers also on light duty for medical reasons were given relatively superior assignments in comparison. Carson also claims that Della often changed his schedule and required Carson to work nights, which interfered with his physical therapy and court appointments. On balance, because Carson has not sufficiently established that any of this conduct constitutes an adverse employment action—the second element of the prima facie case—summary disposition of his disparate treatment claims is warranted.

Carson's disparate treatment claim is identical to White's and compels the same conclusion—the "degrading assignments," even assuming that they were objectively less desirable than others available to an officer with Carson's medical issue, were not adverse employment actions. *See Holland*, 487 F.3d at 219 (defining an adverse action as one that "adversely affects the terms, conditions, or benefits of the plaintiff's employment"). "The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action" absent a "significant detrimental effect." *Id.* Carson has not proven or cited facts from which a reasonable jury could find that Carson's "degrading assignments" had "a tangible effect on the terms and conditions of employment," *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 737 n.6 (D. Md. 2009), such as a "decrease in compensation, job title, [or] level of responsibility." *Holland*, 487 F.3d at 219. Nor has Carson sufficiently demonstrated that he suffered "humiliation" as a result of the assignments. *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 601 (D. Md. 2011).

The same flaw affects Carson's claim that Della "constantly" changed Carson's schedule. Carson has not proffered evidence or an explanation for how the shifting of his schedule was a sufficiently adverse change to the terms and conditions of his employment. In his deposition, Carson explained that Della assigned him to the 4 p.m. to 2 a.m. shift, and later the 5 p.m. to 3

a.m. shift, which did not leave Carson much time to sleep before he had to travel to his physical

therapy appointments typically at 10:45 or 11:45 a.m.  (ECF No. 65-44 at 63:5-7, 64:8–24).

Carson has not proffered any evidence other than his deposition, however, such as proof that he

was unable to change his appointments and as a result consistently lost sleep.  Moreover, when

Della informed Carson on September 1, 2010 that "personnel on light duty status will be

assigned to both day and evening shifts . . . alternating each week between days and evening to

include weekends," Carson responded "ok, works for me."  (ECF No. 65-43).  Although

acquiescing to a manager's decision does not preclude an employee from later alleging it to be

discriminatory, the fact that Carson initially lodged no objection when told that he would be

required to work some night shifts is indicative.  Finally, Carson has not proven or introduced

evidence demonstrating that he constantly worked the night shift, and did not alternate between

that and the daily shift as Della indicated in the email.  Nor does Carson cite evidence of non-

African American officers who were preferentially assigned to more day shifts than night shifts,

or who were assigned no night shifts at all.  *Cf. Settle v. Baltimore Cnty.*, 34 F. Supp. 2d 969,

1002 (D. Md. 1999) ("As one might imagine, the entire issue of scheduling for a police

department . . . is necessarily resolved by multiple criteria.").  Such evidence would certainly be

probative on whether Carson's schedule was an adverse employment action, as well as on the

ultimate question of Della's intent.

Because Carson has not sufficiently alleged a prima facie case of disparate treatment in

regards to his work assignments and schedule, the City's motion for summary judgment on that

claim is granted.

**B. Hostile Work Environment.**

Next, Carson alleges that he was subjected to a racially hostile work environment based on the following instances—the degrading light duty assignments and changes to his work schedule discussed above, the then-City Manager inquiring about Carson's credibility, and being required to see a City physician prior to returning from medical leave.  Like his co-plaintiffs' hostile work environment claims, Carson fails to establish the third prong of the prima facie case, that the alleged discriminatory conduct was sufficiently "severe or pervasive."

First, the "degrading assignments" complained of by Carson, even if they were adverse employment actions, were certainly not part of a systematic pattern.  Carson himself acknowledged that "I wouldn't say I would take out the trash. I was putting trash bags together for boxes . . . It probably took me about 15 minutes." (ECF No. 74-4 at 77:11–13, 17). Moreover, Carson responded "no" when asked whether he had "ever been required to do that again or before that"—it appears, therefore, to have been a single instance.  (*Id.* at 77:18–20). Second, as to Della changing his schedule, Carson appeared to answer the question of how many times Della changed his schedule with "two, two to three times would be the fair share." (ECF No. 74-4 at 78:11–12).  Even if those individual instances were discriminatory, their rarity undermines any notion that Carson faced "severe or pervasive" and harassing conduct.   Finally, regarding the latter two instances, Carson provides no evidence to support either that those events occurred as he recalls them, or that they constituted "an objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Absent more evidence or argument by Carson, I find that the record is too thin to support his hostile work environment claim.  Accordingly, summary judgment is granted to the City.

C. **Retaliation.**

Carson's last claim is that the APD retaliated against him for filing an internal complaint in February 2011 and his EEOC charge on June 21, 2011.  The adverse employment actions he cites as retaliatory are once again the "degrading" work assignments and schedule changes made by Della.  Summary judgment in the City's favor on this claim is also warranted.

First, Carson fails to establish the second element of a prima facie retaliation claim—that the alleged retaliatory acts constituted materially adverse employment actions.  Rather than repeat my analysis above, I will simply state the conclusion: neither constitute retaliatory acts under Title VII.

Second, even if they were adverse actions, Carson appears to sever any causal connection by his own admission: "I don't think [Della] knew at the time that the complaint was filed against him. He didn't find out until a little but later but, in the meantime, he definitely continued to change my hours."  (ECF No. 65-44 at 63:1–4).  If Della was unaware of Carson's protected activity, he could not have retaliated against Carson for it.  *See, e.g.*, *Taylor v. Anne Arundel Cnty.*, Civ. No. WDQ-12-2468, 2015 WL 134197, at *13 (D. Md. Jan. 8, 2015) ("If a plaintiff cannot establish that the decisionmaker had knowledge of the protected activity at the time of the adverse employment action, her retaliation claim must fail.").  Carson's own testimony, when combined with the lack of any temporal proximity evidence (namely when each alleged retaliatory incident occurred in relation to the filing of complaints and charges), precludes him from opposing the City's motion for summary judgment on this claim.

**CONCLUSION**

On each of their claims, plaintiffs fail to cite admissible evidence to oppose the City's

motion for summary judgment.  The core of their response in opposition brief is their own

testimony, but more is required to rebut the City's proffered documents and explanations.

Accordingly, the City's motion is granted.


_____08/21/2015_____                    _____/s/_____
Date                                          J. Frederick Motz
                                              United States District Judge